[Civ. No. 34297. Second Dist., Div. Four. Mar. 18, 1970.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS,
Plaintiff and Respondent, v.
SAMUEL YOUNGER et al., Defendants and Appellants.

## COUNSEL

Balaban, Berman, Taylor, Selan, Urbach & Paul, Balaban, Berman, Taylor, Selan & Paul and Morse Taylor for Defendants and Appellants.

Harry S. Fenton, Joseph A. Montoya, Richard L. Franck, Robert L. Meyer and Jack M. Miller for Plaintiff and Respondent.

## OPINION

**DUNN, J.**—Plaintiff's eminent domain action sought condemnation of parcels of non-contiguous unimproved property owned by defendants Younger and encumbered by a trust deed. The parcels are located approximately three miles north of the community of Castaic in Los Angeles County and are separated by Highway 99, one larger parcel lying to the west and two larger parcels to the east. These three larger parcels are each composed of smaller parcels to be taken for different purposes, *i.e.*: a fee taking or some type of easement. Following a trial, the jury awarded defendants $23,041 as the value of the part taken and $4,000 in severance damages. Defendants' motion for new trial was denied. Defendants Younger appeal, raising three points of claimed error.

## I. *Did the Trial Court Err in Granting Respondent's Motion to Quash a Subpena Duces Tecum Served upon Robert Flavell?*

Pursuant to their joint pretrial statement and the pretrial order the only issue between the parties was that of damages, on which appellants had the burden of proof. (*City of Santa Cruz* v. *Younger* (1963) 223 Cal.App.2d 818, 822 [36 Cal.Rptr. 253].) Accordingly, appellants undertook the burden of going forward with the evidence. They called a real estate appraiser as their expert on evaluation and desired also to call Robert Flavell, apparently an independent appraiser retained by respondent to appraise the properties, but whom respondent did not intend to call as a witness.[1]

The case was first called for trial on May 27, 1968. On May 16th appellants had served Flavell with a subpena duces tecum requiring him to appear and bring his appraisal report.[2] Court and counsel discussed the propriety of the subpena on the first day of trial and the court requested argument. Counsel for appellants claimed a right to see the report; "to call him as a witness and have him produce that report." On the next trial day, respondent made a formal motion to quash the subpena; this was argued at length and taken under submission by the court. On June 11th, at a time when appellants were still going forward with the evidence, the court granted the motion and ordered the subpena duces tecum quashed. Appellants contend this was error.

A motion to quash is a procedurally appropriate method of testing the validity of a subpena duces tecum. (*Pelton Motors, Inc.* v. *Superior Court* (1953) 120 Cal.App.2d 565 [261 P.2d 275]; 54 Cal.Jur.2d, Witnesses § 10, pp. 210-216,) Code of Civil Procedure section 1985 provides for such a subpena before trial, requiring for the issuance thereof an affidavit showing, among other things, "good cause for the production of the matters and things described in such subpoena," and further requiring that it shall set forth "in full detail the materiality thereof to the issues involved in the case."

To show good cause, appellants' affidavit states only that "Said information is in the custody and possession of Robert H. Flavell, and is not available from any other source." The trial court found this to be inade-

---

[1] Through pretrial procedures, the parties were required to and did before trial exchange reports of appraisers upon whom they intended to rely. Appellants relied upon the report and opinions of appraiser James Mason and respondent upon appraiser Harrison Baker, Jr. Neither side relied upon Flavell.

[2] Though appellants' brief states Mr. Flavell's work and capacity, the record furnished to us does not disclose it nor does it contain a copy of the subpena duces tecum and its accompanying affidavit. As a result of appellants' neglect, we have sent for and reviewed the superior court file (rule 12, Cal. Rules of Court), with permission of the parties.

quate,[3] further finding that "the statement that there is no other information available from any other source is not true because the property is available to anyone to inspect and to make their own appraisal."

There was no error. Code of Civil Procedure section 2036, subdivision (a) provides: "A party required to show 'good cause' . . . shall show specific facts justifying discovery and mere proof of the relevance of the information sought to the subject matter of the action shall not be sufficient." Appellants' mere statement that Flavell had the appraisal report sought hardly demonstrates "good cause." The added statement that the information was not elsewhere available also was insufficient.

■ As to "materiality" (as required by Code Civ. Proc., § 1985) appellants' affidavit stated only that "The requested information is of value in establishing the value of the property which is the subject of this action." The affidavit thus contains no adequate showing of either good cause or materiality.[4] (*Johnson* v. *Superior Court* (1968) 258 Cal.App.2d 829, 834-837 [66 Cal.Rptr. 134].) ■ *McClatchy Newspapers* v. *Superior Court* (1945) 26 Cal.2d 386, 396 [159 P.2d 944]: "A party or witness has a constitutional right to be free from unreasonable searches and seizures, and it is therefore incumbent upon the one seeking an inspection to show clearly that he has a right thereto and that the constitutional guarantees will not be infringed. ■ *Hence, the affidavit in support of the demand for inspection . . . [of books, papers, etc.] . . . must clearly show that they contain competent and admissible evidence which is material to the issues to be tried.* [Italics added.] The affiant cannot rely merely upon the legal conclusion, stated in general terms, that the desired documentary evidence is relevant and material." (Cf. *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 393-395 [15 Cal.Rptr. 90, 364 P.2d 266].)

A further ground raised by respondent and supporting the trial court's ruling appears in the record. Thus, there was no showing the witness was to be, or could be, called by appellants for cross-examination under Evidence Code, section 776 (see: *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 426 [82 Cal.Rptr. 1]) and obviously he was not to be called in rebuttal; appellants thus sought to produce the witness and his record on their case in chief, as a valuation witness according to counsel's statement. ■ But the pretrial order required an exchange between the parties of the reports of appraisers upon whose opinions

---

[3]This appears in the reporter's transcript. The making of any formal findings on matters of law was specifically waived by both sides.

[4]The court did not base its ruling upon, nor are we here concerned with, any contention that the report, itself, was privileged, in which respect see: *San Diego Professional Assn.* v. *Superior Court* (1962) 58 Cal.2d 194, 203-204 [23 Cal.Rptr. 384, 373 P.2d 448, 97 A.L.R.2d 761].

they intended to rely and this precluded appellants from calling Flavell as an evaluation witness, there being no indication of an exchange of Flavell's report by either side.

On examining the record, one readily may conclude that appellants had never seen Flavell's report, did not know what it contained but assumed it was favorable to them, and chiefly wanted to examine Flavell so that the jury would know respondent had a witness on evaluation that it did not intend to call. Such purpose would be not only irrelevant but highly improper as shown by *People* ex rel. *Dept. of Public Works* v. *Miller* (1964) 231 Cal.App.2d 130, 134-135 [41 Cal.Rptr. 645]; *City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d at pp. 425-426; *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 201-203 [41 Cal. Rptr. 721].

We conclude the trial court did not err in quashing the subpena.

II. *Did the Trial Court Err in Excluding From the Jury's Consideration of Severance Damages, Twenty Acres of Appellants' Land Abutting Their Larger Westerly Parcel?*

As already noted, appellants' "westerly larger parcel," of approximately 200 acres lay to the west of Highway 99 which, for discussion purposes, runs in a north-south direction. At a time in 1946 when the state was converting Highway 99 from a conventional highway to a freeway, the state had, by a grant deed from Marianne and Martin Gelos recorded in June 1946, acquired all the Gelos' abutter's rights appurtenant to this parcel, including the right of access to Highway 99. The grant deed excepted and reserved to the grantors, however, a 20-foot right of access to the freeway located along the easterly boundary of the parcel near its northeasterly corner. (For "freeway" defined, see: Veh. Code, § 332.) The parcel was acquired by appellants Younger 17 years later. It is their rights in this 20-foot strip that are involved in the dispute here considered.

Appellants acquired their interests in the "westerly larger parcel" in July 1963. Inasmuch as titles to the parts forming this parcel were taken separately by appellants as separate property, the parcel was, for convenience of description, divided into four areas. An additional 20-acre area, called "area 5" was acquired by appellants jointly in October 1965. Area 5 abutted the westerly larger parcel on the south toward the westerly side and was not a part of the dominant estate composed of areas 1 through 4. Prior to its acquisition by appellants, it had no easement across the four areas lying north of it, for ingress and egress through the 20-foot access easement onto the freeway.

By the present action respondent sought, among other things, to take

and close the 20-foot access onto the freeway. Respondent's plan was to create a divided freeway having no access openings except for grade separation interchanges, using Highway 99 for traffic traveling in one direction only and creating another north-south highway (paralleling the old Ridge Route) as its companion one-way freeway. Appellants claimed the closing of the 20-foot access easement would diminish the value of the westerly parcel, and contended area 5 should be considered as part of this westerly parcel for the purpose of computing severance damages arising when the state took and closed the 20-foot access easement.

The date of value for condemnation purposes (Code Civ. Proc., § 1249) was June 9, 1967. ■ At the trial, and here, respondent contended area 5 should not be considered part of the westerly parcel in any computation of severance damage. The problem was properly presented to the trial court to rule on as a matter of law (*People* ex rel. *Dept. of Public Works* v. *Los Angeles County Flood etc. Dist.* (1967) 254 Cal.App.2d 470, 477 [62 Cal.Rptr. 287]) and the court concluded area 5 should be excluded. We agree.

Many cases have held that the owner of property abutting upon a public street has a property right in the nature of an easement of ingress and egress to and from his property. Here, appellants' predecessors in interest had deeded to respondent all such rights but, by exception and reservation contained in the grant deed, had described and specifically reserved a 20-foot easement. ■ There is no doubt that "The taking of an easement of access to public highways is compensable measured in terms of severance damages, that is, in terms of the diminution in the value of the property which formerly had the easement of access." (*People* ex rel. *Dept. of Public Works* v. *Logan* (1961) 198 Cal.App.2d 581, 586 [17 Cal.Rptr. 674].) ■ This private right of access is an easement appurtenant to the property (*People* ex rel. *Dept. of Public Works* v. *Logan, supra,* p. 586) which is the dominant tenement. (Civ. Code, § 803.)

Here, the dominant tenement existing at the time the access opening was reserved consisted only of areas 1, 2, 3 and 4, comprising the larger westerly parcel. ■ It is a further rule that the owner of an easement " ' . . . cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden.' " *Wall* v. *Rudolph* (1961) 198 Cal.App.2d 684, 686 [18 Cal.Rptr. 123, 3 A.L.R.3d 1242]. By adding area 5 to the other areas, appellants would over-burden the easement. It has been held that "Use of an appurtenant easement for the benefit of any property other than the dominant tenement is a violation of the easement because it is an excessive use . . . such use would amount to an increase of burden upon the servient tenement . . . and the rule

applies 'whether the easement is created by grant, reservation, prescription, or implication.' " *Wall* v. *Rudolph, supra,* p. 695. (Also see: *Myers* v. *Berven* (1913) 166 Cal. 484, 489 [137 P. 260].)

■ Since ownership of area 5 carried with it no right of ingress and egress to the highway through the 20-foot access easement, it follows that area 5 properly was excluded from consideration in computing damages for severance of the access. (See: *People* ex rel. *Dept. of Public Works* v. *Los Angeles County Flood etc. Dist., supra,* 254 Cal.App.2d 470.)

III. *Did the Trial Court Err in Its Rulings Regarding Legal Access to the Southeasterly Larger Parcel and to the Northeasterly Larger Parcel?*

■ Legal access to the "northeasterly larger parcel" and to the "southeasterly larger parcel," as it existed on the date of value, was of significance in determining the value of properties taken and severance damages to those not taken. These parcels lay east of existing Highway 99. For the convenience of discussion at trial, they were referred to as "area X" and "area Y," respectively. They were separated by "area D" and "area E." For better visualization of the properties, a sketch map showing them, as well as the westerly larger parcel, is here reproduced. [See, *infra,* p. 584.]

Appellants' predecessor in interest had owned all four areas lying to the east of the highway. As of November 1964, through various conveyances, area X (the northeasterly larger parcel) was owned by Dulcy Younger as her separate property, area D was Samuel Younger's separate property, Dulcy owned area E as her separate property and Samuel owned area Y (the southeasterly larger parcel) as his separate property. In March 1966 Samuel Younger sold area D to Mr. and Mrs. Demetropoulos and in May 1966 Dulcy Younger sold area E to Mr. and Mrs. Etter. Before such sales, however, in January 1966, Samuel conveyed to Dulcy a non-exclusive easement for ingress and egress around the perimeters of areas D and Y then owned by him, and Dulcy conveyed to Samuel similar easements around areas X and E which she then owned.

Located in the westerly boundary of area X was a 20-foot wide access to U.S. Highway 99. Area E, at its northeasterly corner, had access onto the "old Ridge Route." It is appellants' claim that, by virtue of the perimeter easements, there was appurtenant to area Y on the date of valuation, the right of ingress and egress through the access easement located in area X, and for this reason appellants' expert appraiser should have been permitted to consider it in computing damages to area Y.

Appellants' other contention is that area X had a perimeter easement along the boundaries of areas D and E to area Y and therefore had a right

of access to the opening in area E giving onto the old Ridge Route. Just how respondent's taking affected this, we are not advised by appellants; presumably, in some way it affected the appraiser's opinion as to the value of area X prior to the respondent's taking and closing of its access onto Highway 99.

After admitting oral, documentary and stipulated evidence, and with the benefit of much argument by counsel who also submitted written points

and authorities, the trial court made its ruling and advised the jury that, on the date of value ". . . the only legal access of the northeasterly parcel [area X] was through the 20-foot right-of-way . . . to Route 99 and the only legal access from the southeasterly parcel [area Y] was over the perimeter easement on the Etter property [area E] and over to the old Ridge Route." It is this ruling of which appellants complain.

*Southeasterly Larger Parcel.* By virtue of the granting of the perimeter easements, area Y (the southeasterly larger parcel owned by Samuel Younger) was a dominant tenement having a right of access around area E, the servient tenement then owned by Dulcy Younger. By using the perimeter of area E, area Y was afforded access to area E's opening onto the old Ridge Route. Inasmuch as Samuel Younger also owned area D it, too, could be reached by traversing the borders of area E. Furthermore, since Dulcy Younger had conveyed to Samuel Younger a perimeter easement around area X, he thus could reach the access opening onto Highway 99 held by area X.

When Dulcy conveyed area E to the Etters she could convey only the title she then possessed, so that the burden of an easement around the perimeter of area E in favor of area Y continued in existence. However, Samuel Younger owned not only area Y, lying to the south of area E, he also owned area D lying to the north. Because of his ownership of both properties, he could not claim an easement over area D for the benefit of his own area Y, since "A servitude thereon cannot be held by the owner of the servient tenement." Civil Code, section 805. No legal instrument purported to convey any easement around area D for the benefit of area Y. When Samuel Younger conveyed area D to the Demetropoulos' his deed reserved no easement around or across such property. Accordingly, the Demetropoulos' took it unburdened by any easement favoring area Y. Samuel Younger thus cut area Y off from access to area X (owned by Dulcy) and its opening onto Highway 99.

*Northeasterly Larger Parcel.* By virtue of the granting of the perimeter easements, area X was a dominant tenement having right of access around area D, the servient tenement then owned by Samuel Younger. By using the perimeter of area D, area X had access to area E, then owned by Dulcy Younger, and its opening onto the old Ridge Route. Alternately, area X had circuitous access to the opening in area E by traversing the perimeters of area D (owned by Samuel), area E (owned by Dulcy) and area Y (owned by Samuel), thence backtracking from area Y northerly along area E to its same opening in the old Ridge Route.

When Dulcy conveyed area E to the Etters she reserved in it no easement for the benefit of area X. Because she had owned both area X and area E

she had not been in position to claim an easement over area E for the benefit of area X (Civ. Code, § 805). And when Dulcy conveyed area E to the Etters free and clear of any easement favoring area X, she thus cut off area X from the use of area E to reach its opening on the old Ridge Route, either directly from area D or by the circuitous route involving area Y.

To sum up, we conclude that the trial court's ruling regarding access was correct.

Appellants argue that Civil Code section 805 states a rule to be used only in interpreting written instruments, and not a rule of substantive law. Founded upon this contention, appellants claim the instruments they executed granting perimeter easements clearly disclosed their intention to create access for all four parcels to the 20-foot opening in area X and to area E's opening onto the old Ridge Route.

Several factors work against this argument. First of all, appellants cite no authority for their interpretation of Civil Code, section 805 which, on its face, states a rule of law. ▇▇▇ Second, rules for interpreting conveyances require them to be construed most strongly against the grantor. *Orr v. Kirk* (1950) 100 Cal.App.2d 678, 681 [224 P.2d 71]. Thus, when Samuel and Dulcy Younger conveyed areas D and E to the Demetropoulos' and to the Etters, respectively, without reserving thereover any easements, they created no basis for inferring a contrary and unexpressed intent.

Appellants seemingly further contend that easements around areas D and E were created by implication. We are directed to no part of the record supporting such contention or requiring such a finding, and our independent review of the record discloses none. There is scant or no indication that the Demetropoulos' and the Etters took their respective areas burdened by any easement of implication in favor of areas X and Y. ▇▇▇ Furthermore, "The law does not favor the implication of easements." *Orr v. Kirk, supra,* at p. 681. (And see: 17 Cal.Jur.2d, Easements, § 15, pp. 142-144.)

Appellants now claim for the first time in the case that areas X and Y had other legal routes of access open to them, consisting of a system of dirt roads throughout Marple Canyon in which these parcels lay. By the use of this road system, appellants contend, the two parcels had access to both outlets, *i.e.*: The 20-foot access onto Highway 99 and the access onto the old Ridge Route. Such contention not only is unsupported by the record but is directly contrary to it and to the position taken by appellants at the trial. There, they conceded that the so-called dirt road system (which was not maintained, was not traversable in many places and which included bare trails) ran across numerous intervening properties, as to the owners of

which they probably would be trespassers and which afforded no "legal" access to areas X and Y. At the trial they showed only that such road system might afford "physical" access, if open to use.

They now contend for a "legal" right to use the road system, based upon a claim of easements by implication. Such theory is foreign to any expressed at the trial and is contrary to what appellants there conceded. There was no evidence of grants by or to appellants involving the third parties over whose properties the dirt roads and paths ran; nor was there any showing, as now contended for the first time by appellants, of a right-of-way by necessity to use such road system. (See: 2 Witkin, Summary of Cal. Law (1960) Real Property, § 188, p. 1027, and 1969 Supp., Real Property, § 188, p. 450.)

In summary, we find no error in the conclusion reached by the trial court as to the legal accesses available to areas X and Y.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 15, 1970.